IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| NORTHERN REGAL HOMES, INC. and RICK WILLIAMS,<br><br>　　　　　　　　　Plaintiffs,<br><br>v.<br><br>ROUNDPOINT MORTGAGE SERVICING CORPORATION and NATIONSTAR, INC.,<br><br>　　　　　　　　　Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY; AND DENYING DEFENDANT'S MOTION TO EXCLUDE EXPERT TESTIMONY**<br><br>Case No. 1:15-cv-00035-JNP-BCW<br><br>District Judge Jill N. Parrish |

Before the court are the parties' cross motions for summary judgment and motions to exclude expert testimony. [Dockets 51, 52, 57, 60]. The court heard oral argument on the motions on November 9, 2016 and took the motions under advisement. After considering the parties' memoranda and oral arguments, as well as relevant case law and the record before it, the court GRANTS IN PART and DENIES IN PART Plaintiffs' Motion for Summary Judgment, and GRANTS IN PART and DENIES IN PART Defendant's Motion for Summary Judgment. The court also DENIES both parties' motions to exclude expert Testimony.

## FACTUAL BACKGROUND

In November 2006, Plaintiffs Northern Regal Homes, Inc. and Rick Williams (collectively "Borrowers") entered into a construction loan agreement with Barnes Banking Company ("Barnes") for the purpose of constructing a single-family residence in Hooper, Utah

(the "Property"). Borrowers executed a promissory note (the "Note") for the principal amount of $295,600.00 that had a maturity date of August 15, 2007. As security for the Note, Borrowers also executed and recorded with the Weber County Recorder's Office a construction deed of trust in favor of Barnes (the "Deed of Trust"), encumbering the Property.[1] In May 2007, Borrowers and Barnes entered into a Change in Terms Agreement. The Change in Terms Agreement converted the construction loan to a five year loan, extending the maturity date of the Loan to January 10, 2014.

At the beginning of 2010, Barnes ceased its operations. The Federal Deposit Insurance Corporation, as receiver for Barnes, assigned the Loan and its related benefits and obligations to a third party entity known as 2010-3 SFR Venture, LLC ("SFR"). SFR transferred servicing of the Loan to Defendant Nationstar, Inc. ("Nationstar") in June 2010, and then to Defendant RoundPoint Mortgage Servicing Corporation ("RoundPoint") in February 2011. Through all of these changes, Borrowers made their required monthly payments to the appropriate entity, including to RoundPoint beginning in February 2011.

When RoundPoint took over the servicing of the Loan in February 2011, the Loan file that Nationstar transferred to RoundPoint indicated a monthly "due for" date of June 2010, rather than the correct date of February 2011. Prior to transferring the Loan file to RoundPoint for servicing, Nationstar had recategorized a number of previous monthly payments made by Borrowers to the "suspense account" for the Loan. It is unknown why this recategorization took place. Thus, when it took over the servicing of the Loan, RoundPoint's records indicated that Borrowers were late on their payments. Despite these errors in its records, RoundPoint accepted

---

[1] The parties' agreement consists of the construction loan agreement, the Note, and the Deed of Trust. These agreements are sometimes referred to collectively as the "Loan."

Borrowers' payments and applied them to the Loan account from February 2011 to October 2011.

Although all monthly payments had been timely paid by Borrowers and accepted by each of the various servicers to that point, RoundPoint sent a letter to Borrowers on October 13, 2011, informing them that the Loan was in default. The October 13 letter requested that Borrowers pay $9,286.35 to cure the alleged default and asserted that "RoundPoint may take steps to terminate [Borrowers'] ownership in the property by a foreclosure proceeding or other action to seize the property." Borrowers responded by letter dated October 25, 2011, explaining to RoundPoint that Borrowers had not missed any payments and disputing the alleged default. Borrowers proceeded to send their November payment by check to RoundPoint only to have the payment rejected and the check returned. Again in December 2011, Borrowers tendered payment to RoundPoint (enclosing check payment for both November and December), only to have their payment again rejected and the checks returned to them. Borrowers again sent payment to RoundPoint in January (enclosing check payment for November, December, and January) only to have RoundPoint reject the payments and return the checks to them once again. Borrowers continued this same practice of sending the current month's payment, as well as the previously rejected payments, over the subsequent few months. In total, RoundPoint received and then rejected and returned Borrowers' payments for six months from November 2011 to April 2012. After these six consecutive payments were rejected by RoundPoint, Borrowers ceased making payments. When asked about the October 13 letter declaring the Loan to be in default and the rejection of payments from November 2011 to April 2012, RoundPoint's representative testified that the declaration of default in October 2011 was erroneous and that RoundPoint should not have rejected Borrowers' payments during that six month period.

Although no default had occurred and in spite of efforts by Borrowers to point out the errors in RoundPoint's Loan records, RoundPoint recorded a notice of default with Weber County on April 23, 2012. Because of the apparent dispute regarding default, RoundPoint cancelled its filing of the notice of default the following month. But in a letter dated June 14, 2012, RoundPoint re-affirmed its position that Borrowers were in default for failure to pay amounts due. The June 14 letter requested a payment of $30,763.88 to cure the alleged default and stated that if the alleged default "is not cured by July 14, 2012, RoundPoint may take steps to terminate [Borrowers'] ownership in the [P]roperty by a foreclosure proceeding or other action to seize the [P]roperty."

Until April 2012, the Property had been rented to a tenant, Ben Rose, and his family. Mr. Rose and his family moved out of the Property on or about June 12, 2012. After Mr. Rose and his family moved out, he and Plaintiff Rick Williams returned to the Property together to conduct a post-lease walkthrough inspection on June 19, 2012. Two days later, while conducting an inspection of the Property for compliance with the terms of the Loan, RoundPoint's agents discovered that the Property was vacant. Three days after discovering the vacancy, RoundPoint's agents "secured the Property" by changing the locks on the doors of the Property and disabling the garage door opener. RoundPoint's agents also cut the grass, winterized the Property, and ensured it was in compliance with all local ordinances. RoundPoint posted a sign on the front window of the Property stating that the home was being managed by RoundPoint's agent. Borrowers discovered they were locked out of the Property on June 26, 2012.

Borrowers sent RoundPoint a letter dated August 20, 2012, informing RoundPoint that Borrowers continued to dispute the existence of a default and that they had been locked out of the Property and were unable to access the property or rent or otherwise make use of the

Property as a result. RoundPoint responded with a letter dated September 24, 2012, in which it acknowledged the errors present when the Loan file was transferred to RoundPoint in February 2011, but made the erroneous declaration that the Loan had matured on August 15, 2007, despite the fact that the maturity date had been extended to January 10, 2014 by the Change in Terms Agreement. RoundPoint recorded a second Notice of Default and Election to Sell with the Weber County Recorder on April 18, 2013 and notified Borrowers of that recording about a week later.[2] In response to yet another letter from Borrowers disputing the validity of the alleged default and stating the Property was being wrongfully taken from them, RoundPoint asserted that it believed any problems had already been resolved, again alleged that the loan had matured on August 15, 2007, and informed Borrowers that "collection efforts will continue because the debt is verified as valid."

RoundPoint moved forward with foreclosure proceedings, causing a Notice of Trustee's Sale to be issued on July 30, 2013 and posting that Notice on the front door of the Property the next day. RoundPoint also published a Notice of Trustee's Sale in the local newspaper one day per week for three consecutive weeks and on the internet. But RoundPoint did not ever go through with the Trustee's sale because it "became apparent that the status of the payments on the Property was still in dispute." RoundPoint filed a cancellation of its second Notice of Default with the Weber County Recorder on January 29, 2014.

Ultimately, on September 26, 2013, RoundPoint sent Borrowers a letter acknowledging errors in the Loan file with regard to the payments, the maturity date, and the payment due date when the Loan was transferred to it in February 2011. The September 26 letter also offered to reconcile the account and work with Borrowers to reinstate the loan. But the reinstatement quote

---

[2] RoundPoint, as servicer of the Loan, pursued the foreclosure as attorney-in-fact for the beneficiary of the Deed of Trust, SFR.

included with the letter stated that the Borrowers owed RoundPoint $52,098.12, including fees and other expenses incurred by RoundPoint up to that point in pursuing the alleged default and erroneous foreclosure. Borrowers did not respond to this offer of reinstatement and the Loan matured on January 10, 2014. Borrowers initiated this lawsuit in September 2014, bringing claims against RoundPoint for unjust enrichment, lender liability, and breach of contract.

## ANALYSIS

### I.      Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A dispute is genuine only if "a reasonable jury could find in favor of the nonmoving party on the issue." *Macon v. United Parcel Serv., Inc.*, 743 F.3d 708, 712 (10th Cir. 2014). "In making this determination, 'we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party.'" *Id.* at 712–13 (quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1225 (10th Cir. 2000)).

The parties are cross-moving for summary judgment on Borrowers' fourth cause of action for breach of contract. RoundPoint also moves for summary judgment on Borrowers' first and third causes of action for unjust enrichment and lender liability, respectively. The court will first address the cross motions on the breach of contract claim. The court will then consider RoundPoint's motion on the remaining two claims.[3]

---

[3] In RoundPoint's response memorandum to Borrowers' motion for summary judgment on the breach of contract claim, RoundPoint makes a general objection to Borrowers' Statement of Elements and Undisputed Material Facts on two grounds—first, that it contains statements presented in the nature of argument, and second, that Borrowers fail to support their undisputed facts with admissible evidence. The court will disregard any argumentative or unsupported statements, but otherwise OVERRULES RoundPoint's general objection. The court finds that the facts upon which Borrowers rely are supported by "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations,

II.    **Cross Motions for Summary Judgment on Borrowers' Fourth Cause of Action for Breach of Contract**

To establish liability for a breach of contract under Utah law, a plaintiff must prove the following elements: (1) a contract, (2) performance by the party seeking recovery, and (3) breach of the contract by the other party. *Bair v. Axiom Design, L.L.C.*, 20 P.3d 388, 392 (Utah 2001). In order to recover on a breach of contract claim, the plaintiff must also prove damages as a result of the breach of the contract. *Id.*

The parties agree that a contract existed between them—the Note, the construction loan agreement, and the Deed of Trust (collectively the "Loan"). The remaining elements of the Borrowers' performance under the Loan, RoundPoint's performance and alleged breach of the Loan, and damages will be analyzed in turn below. The court finds that there is no dispute as to any material fact relating to each party's performance under the Loan and that RoundPoint is liable as a matter of law for breach of contract. However, the court finds that there are material factual disputes relating to the question of damages.

A.    **Borrowers' Performance**

The parties do not dispute the facts regarding the Borrowers' performance under the Loan. RoundPoint argues that Borrowers failed to perform as a matter of law in two respects: (1) Borrowers stopped making their required payments, and (2) Borrowers either abandoned or left the Property unattended in violation of the Deed of Trust. Borrowers argue that they performed under the Loan as a matter of law by making all loan payments to RoundPoint and its predecessors up until RoundPoint rejected six consecutive monthly payments, and that they never abandoned or left the Property unattended in violation of the Deed of Trust.

---

stipulations, admissions, interrogatory answers or other materials" obtained in the discovery process. *See* Fed. R. Civ. P. 56(c)(1)(A).

### 1)      Borrowers' Payment Obligation

RoundPoint does not dispute that Borrowers performed their payment obligations under the Loan up until they ceased making payments in April 2012. RoundPoint argues that even after it reconciled the payment issues with Borrowers' Loan account, Borrowers failed to make any additional payments due and have also failed to pay the amount due upon the maturity of the Loan in January 2014. Borrowers assert their full performance of their payment obligation under the Loan through April of 2012 and contend that they were excused from performance after that date. Specifically, Borrowers contend that after RoundPoint had rejected six consecutive payments, it was futile for them to continue making payments. Borrowers rely on a series of cases from the Utah Court of Appeals to support their position that they were excused from making further payments because "it is axiomatic that the law does not require a useless and futile act." *State ex rel. A.C.*, 97 P.3d 706, 714 (Utah App. 2004) (*quoting In re Daniel M.*, 2002 WL 31174257, at *7 n. 26, (Conn. Super. Ct. Aug. 27, 2002) (unpublished)). *See also Shields v. Harris*, 934 P.2d 653, 655 (Utah App. 1997); *Jenkins v. Equip. Ctr., Inc.*, 869 P.2d 1000, 1003 (Utah App. 1994).

It is clear that "[a]n exception to the general requirements of a valid tender arises where it is plain and clear that a tender, if made, 'would be an idle ceremony and of no avail.'" *Fitzgerald v. Corbett*, 793 P.2d 356, 359 (Utah 1990) (*quoting* 74 Am. Jur. 2d *Tender* § 4 (1974)). When RoundPoint rejected Borrowers' six consecutive payments from November 2011 to April 2012, it was clear that RoundPoint would not accept further payments and any further tender by Borrowers would be "an idle ceremony and of no avail." The court therefore holds that, as a matter of law, Borrowers performed their obligation to make payments on the Loan because further payments would have been a useless and futile act.

2)     **Borrowers' Obligation to Neither Abandon the Property or Leave It Unattended**

RoundPoint also argues that Borrowers breached the provision in the Deed of Trust wherein the Borrowers agreed "neither to abandon or leave unattended the Property." Roundpoint maintains that Borrowers violated this obligation by abandoning or leaving the Property unattended when their tenant moved out. Roundpoint further argues that because its agents not only changed the locks, but also took other actions to maintain the Property, such as cutting the grass, the Property had been left unattended and required preservation. Borrowers respond that its conduct cannot be construed as abandonment or leaving the Property unattended. Borrowers argue that because their tenant and his family had moved out of the property on June 12, 2012, and that Mr. Williams had been to the Property as recently as two days before and five days after RoundPoint's agent changed the locks, they were fulfilling their obligation under the Deed of Trust.

The Deed of Trust does not define what it means to "abandon" or "leave unattended." But a plain-language reading of these terms indicates that a short-term vacancy such as the one in this case does not violate the occupancy provision of the Deed of Trust. Abandonment is defined as leaving a place "empty or uninhabited, *without intending to return*." *Abandon*, Oxford Dictionaries, *available at* https://en.oxforddictionaries.com/definition/abandon (emphasis added). Unattended is defined as "not supervised or looked after" or "not noticed or dealt with." *Unattended*, Oxford Dictionaries, *available at* https://en.oxforddictionaries.com/definition/unattended.  Neither of these definitions requires someone to be present at the Property at any and all times, nor does either definition mention vacancy or anything else that could be considered short-term. In order to agree with RoundPoint's interpretation, the court would have to construe the term "abandon" or "leave unattended" as meaning that the Borrowers agreed to

never allow a vacancy at the Property. Such a strict reading makes little sense and the court refuses to interpret the Loan documents in a way that conflicts with a plain language and common sense reading of the Deed of Trust. Occasional vacancies in an investment property, even if they are not ideal, are to be expected. There is no evidence that the Property was in disrepair or that the yard was so overgrown or ill-maintained as to suggest abandonment or that the Property had been unattended for any appreciable amount of time. The undisputed facts show there was a short-term vacancy at the Property, but that vacancy does not constitute abandonment nor does that vacancy show the Property had been left unattended. The court therefore concludes that Borrowers adequately performed their obligations under the occupancy provision of the Deed of Trust.

**B.    RoundPoint's Performance**

Borrowers allege various breaches of contract by RoundPoint. Specifically, Borrowers argue that RoundPoint breached the parties' agreement when it failed to accept loan payments and returned them to the Borrowers, erroneously declared a default and wrongfully pursued the non-existent default, and twice initiated foreclosure proceedings when there was no delinquency or other default. Borrowers also argue that RoundPoint breached the Loan agreements when it took control, use, possession, and management of the Property without a right to do so by changing the locks and disabling the garage door openers, thereby depriving Borrowers of any access to the Property.

**1)    RoundPoint's refusal to accept payments, declaration and pursuit of default, and initiation of foreclosure proceedings**

Borrowers first allege breaches of the Loan agreement because RoundPoint refused to accept payments, declared and pursued a non-existent default, and twice initiated foreclosure proceedings with no right to do so. RoundPoint responds with two arguments. First, it asserts that

it did not breach any express provision of the contract and thus cannot be liable for breaching the Loan agreement. Second, it asserts that the rejection of payments, initiation of default, and subsequent acceleration of payments and initiation of foreclosure proceedings were based on an accounting error for which RoundPoint is not responsible.

The court is unpersuaded by either of RoundPoint's arguments. RoundPoint first disputes that Plaintiffs have satisfied their burden of establishing a breach of any express provisions of the Loan documents. RoundPoint relies on *Christiansen v. Farmers Insurance Exchange*, 116 P.3d 259 (Utah 2005), for the proposition that a breach of contract claim only arises from breaches of express contractual provisions. RoundPoint suggests that no express provisions are at play and that Borrowers' claim is properly characterized as a claim for breach of the implied covenant of good faith and fair dealing not pleaded by Borrowers.[4] *See id.* at 261–62 ("A breach of express contract claim arises out of the express terms of the contract, and the breach is proven in relation to those terms. A claim for breach of the implied covenant of good faith and fair dealing, by contrast, is based on judicially recognized duties not found within the four corners of the contract." (citations omitted)). Although the court disagrees with RoundPoint's reading of *Christiansen* and related Utah case law on whether party alleging a claim of breach of the implied covenant must plead it separately from a claim for breach of the express terms of the contract, the court need not elaborate on the subject because RoundPoint breached the express provisions of the Loan. For example, RoundPoint breached its obligation in the Note to "appl[y] [payments] first to any unpaid collection costs; then to any late charges; then to any accrued unpaid interest; and then to principal" when it refused to accept Borrowers' payments and returned them. Indeed, RoundPoint's representative testified that RoundPoint's position "is that

---

[4] Borrowers previously made a motion to amend their complaint to include a claim for breach of the implied covenant of good faith and fair dealing, but that motion was denied. [Docket 29].

[it] should not have rejected those payments." It is clear that RoundPoint had an obligation to accept tendered payment and to apply it in accordance with the above-cited provision.

Additionally, RoundPoint breached terms of the Note, the Deed of Trust, and the construction loan agreement by exercising rights related to an event of default when no such event had taken place. RoundPoint's own representative testified that its declaration of default in October 2011 was erroneous. Each of the Loan documents refers to events of default and RoundPoint's rights to seize the property were contingent on an event of default. The specific breaches of those provisions granting rights exercisable by RoundPoint upon default included declaring a non-existent default and initiating foreclosure proceedings. When RoundPoint asserted it was exercising those rights when no event of default had occurred, it breached the express terms of the Loan. In short, the parties' agreement—like all loans—granted the lender (or its servicer) certain rights, the exercise of which were dependent on the occurrence of some event (usually default). When RoundPoint exercised those rights before the occurrence of the agreed-upon event, RoundPoint breached the express terms of the Loan agreement.

Next, RoundPoint argues that its rejection of payments and initiation of default were based on an accounting error for which RoundPoint is not responsible. RoundPoint admits that it took time for it to understand what happened with Borrowers' Loan account and for it to reconcile the accounting issues inherited from the prior servicer. But RoundPoint maintains that its delay in discovering the issues and its subsequent attempts to reconcile the issues with Borrowers cannot amount to a breach of contract because it was not responsible for the errors in the first place. The law does not support RoundPoint's effort to use the prior servicer as a scapegoat. RoundPoint fails to cite any case law to support its contention that it is not responsible for the errors of its predecessor in interest. And even if RoundPoint were not

responsible for the initial error in accounting, it is at least responsible for its refusal to accept

payments while it researched and sought to resolve Borrowers' claim that the loan was not in

default. Each of RoundPoint's actions in breach of the Loan agreement occurred after it had

become the servicer of the Loan. It was RoundPoint, not the prior servicer, which declared a

default and perpetuated its claim of default, rejected six tendered payments from Borrowers, and

pursued foreclosure proceedings, all in the face of notice from the Borrowers that RoundPoint's

accounting was erroneous. In short, RoundPoint is responsible for all of these breaches of

contract.

### 2)     RoundPoint's "securing" of the Property

Borrowers next allege that RoundPoint breached the Loan agreements when it took

possession and control of the Property, changed all the locks, disabled the garage door openers,

and took over maintenance and care of the Property. RoundPoint responds that it had a

contractual right to secure the Property, citing the following provision in the Deed of Trust:

> LENDER'S EXPENDITURES. . . . [I]f Trustor fails to comply with any provision
> of this Deed of Trust or any Related Documents . . . Lender on Trustor's behalf
> may (but shall not be obligated to) take any action that Lender deems appropriate,
> including but not limited to . . . paying all costs for insuring, maintaining and
> preserving the Property. All such expenditures incurred or paid by Lender for
> such purposes will then bear interest at the rate charged under the Note from the
> date incurred or paid by Lender to the date of repayment by Trustor. . . . Such
> right shall be in addition to all other rights and remedies to which Lender may be
> entitled upon Default.

RoundPoint argues that it properly exercised its right to "take any action that [it] deem[ed]

appropriate" by changing the locks and otherwise "preserving the Property" when it found it

vacant on June 21, 2012. RoundPoint's argument is premised on the assertion that Borrowers had

breached their obligation not to "abandon or leave unattended the Property," or some other

failure to comply with their obligations under the Loan. But as discussed above, Borrowers did

not fail to comply with their obligations under the Loan and neither abandoned nor left the Property unattended. Because the court has determined that Borrowers performed their obligations and did not "fail[] to comply with any provision of this Deed of Trust or any Related Documents," RoundPoint's argument that its efforts to "preserve" the property by changing the locks and disabling the garage doors were contractually authorized fails as a matter of law.

RoundPoint also claims that its "property preservation efforts" should not be construed as it "taking possession and control away from [Borrowers]." RoundPoint argues that its actions to preserve the Property cannot be a breach of contract because they were not taken in opposition to Borrowers' interests and were not intended to deprive Borrowers of possession or control, but rather were taken to protect both parties' interests. Despite RoundPoint's characterization of its intent, the fact remains that its actions did, in fact, deprive Borrowers of the Property. When questioned about RoundPoint's "property preservation efforts," its representative stated that "[t]he intent of securing a property is to make sure that the property is just that, secured, protected, and so it's locked so that no one, in effect, can actually access the property without permission of [RoundPoint]." RoundPoint's representative went on to agree that making sure that "no one" could access the property without RoundPoint's permission would prevent Borrowers from accessing the Property. The court concludes that RoundPoint did take possession and control of the Property and did so without a contractual right. Therefore, RoundPoint breached its obligations under the Loan as a matter of law when it changed the locks and disabled the garage door openers, thereby depriving Borrowers of their right to the Property.

## C.    Damages

"For breach of contract the law of damages seeks to place the aggrieved party in the same economic position he would have had if the contract had been performed." *Mahmood v. Ross*,

14

990 P.2d 933, 941 (Utah 1999) (citation omitted). "Typically, there are two types of damages a non-breaching party can recover in an action for breach of contract: general damages, which flow naturally from the breach, and consequential damages, which, while not an invariable result of breach, were reasonably foreseeable by the parties at the time the contract was entered into." *Id.* at 937 (internal quotation and citation omitted). "To recover consequential damages, a non-breaching party must prove (1) that consequential damages were caused by the contract breach; (2) that consequential damages ought to be allowed because they were foreseeable at the time the parties contracted; and (3) the amount of consequential damages within a reasonable certainty." *Id.* at 938 (internal citations omitted). In order to succeed on a breach of contract claim, "[a] plaintiff is required to prove both the fact of damages and the amount of damages." *Sunridge Dev. Corp. v. RB & G Eng'g, Inc.*, 305 P.3d 171, 176 (Utah 2013) (citation omitted). The amount of damages must be supported by "evidence that rises above speculation and provides a reasonable, even though not necessarily precise, estimate of damages." *Id.* (citation omitted).

Borrowers argue that they are entitled to an award of the present value of their lost investment in the Property going forward for the full term of their investment—thirty years. In total, Borrowers allege that they have suffered a $467,554.67 loss of the present value of their investment (the value of the Property plus the present value of rent over a thirty year period) in the Property and an additional $65,790.01 in attorneys' fees. Borrowers also propose an alternate measure of damages wherein they argue that they are entitled to damages in a number of categories: 1) loss of equity in the amount of $148,003.53; 2) loss of rental income in the amount of $50,078.00; 3) lost cash investment in the Property in the amount of $36,360.00 and lost monthly payments made in the amount of $69,860.14; 4) reputation damages in the amount of $50,000.00; and 5) attorneys' fees of $65,790.01. The total amount of Borrowers' alternate

measure of damages is $420,091.68. Borrowers allege that these damages are the result of RoundPoint's conduct in commencing two separate non-judicial foreclosure proceedings and dispossessing them of the Property.

RoundPoint argues that Borrowers suffered no damages and if they did, the amount is much lower than Borrowers claim. RoundPoint alleges that the Property was not intended by the parties to be a long term-investment. RoundPoint argues that even after the term of the Loan was extended by the Change in Terms Agreement, the term was only for five years, not for thirty years. RoundPoint also disputes the amount of equity Borrowers would have in the Property had they remained in possession and continued making payments on the Loan. In total, RoundPoint's expert estimates Borrowers' equity at the time of the "claimed 'seizure'" to be only $43,413.00 and lost rental income to be only $17,374.00.

It is clear that RoundPoint's breach of contract caused Borrowers to suffer damages. But the facts surrounding the foreseeability and the amount of damages are less clear and lead the court to conclude that there are disputes of material fact regarding the amount of the damages that Borrowers have suffered. For example, Borrowers' expert made his damages calculation over a thirty-year period of time and assumed a monthly rental income from the Property of $1,950.00. In making his calculation, Borrowers' expert also prepared an amortization schedule that assumes that the Change of Term Agreement was paid as agreed and that the Loan was either extended or refinanced until the amount due was paid in full over thirty years. Defendant's expert, on the other hand, determined that damages, if any, should be calculated for a 17 month period—the total amount of time that Borrowers lost control of the property from June 24, 2012 until Borrowers had the opportunity to gain control of the Property again on September 26, 2013, and adding 60 days to allow for Borrowers to resolve the Note terms and to sell or rent the

16

Property again. Further, Defendant's expert assumes a monthly rental income from the Property of $1,800.00 and notes a dispute regarding the amount that Borrowers' previous tenant, Mr. Rose, had been paying in monthly rent. There are additional disputes about whether Borrowers intended to continue to rent the Property or sell it, and the amount of equity in the home as of June 24, 2012 and presently. Given these disputed facts, the calculation of damages is one to be made by the court at trial after hearing all the evidence related thereto.[5]

In summary, the court finds there are no disputes of material fact relating to RoundPoint's liability for breach of contract and the court concludes as a matter of law that RoundPoint is liable for breach of contract. The court accordingly GRANTS Borrowers' motion for summary judgment as it relates to liability for breach of contract and DENIES RoundPoint's motion for summary judgment as it relates to its contractual liability. Because there are disputed material facts regarding the foreseeability and amount of damages, the court DENIES both parties' summary judgment motions on the amount of damages.

## III.   Unjust Enrichment

Borrowers also bring an unjust enrichment claim against RoundPoint. Unjust enrichment may only be used as a theory of recovery where no express contract is present. *TruGreen Cos., L.L.C. v. Mower Bros., Inc.*, 199 P.3d 929, 933 (Utah 2008) (citations omitted). If a contract is present, a party's unjust enrichment claim must stem from different facts and circumstances than those supporting its breach of contract claim. *See id.* The parties do not dispute that there is an express contract that governs their relationship and that the unjust enrichment claim arises out of the same facts as the breach of contract claim. Further, Borrowers do not object to dismissal of

---

[5] There is no jury demand and this case accordingly will be tried to the bench.

their unjust enrichment claim against RoundPoint. The court accordingly GRANTS

RoundPoint's motion for summary judgment on Borrowers' unjust enrichment claim.

## IV.    Lender Liability

RoundPoint also moves the court to grant summary judgment in its favor on Borrowers'

state law claim of "lender liability." RoundPoint argues that it is entitled to summary judgment

because "lender liability" is not a viable cause of action under Utah law. RoundPoint contends

that "lender liability" is a theory of negligence used by third parties to sue a borrowing party's

lender where that lender has gone beyond normal lending practices and become involved in

operation of the borrower's business. Borrowers counter that a "lender liability" claim does not

need to be brought by a third party and claims that when RoundPoint took possession of the

Property and blocked Borrowers from accessing it, RoundPoint breached its common law duties

to the Borrowers. These breaches, Borrowers contend, were outside usual lender conduct and

therefore render RoundPoint liable to Borrowers for "lender liability." The parties each cite to

Utah Court of Appeals cases to support their arguments—Borrowers to *Mecham v. Consolidated*

*Oil & Transp.*, 53 P.3d 479 (Utah App. 2002), and RoundPoint to *DeBry v. Valley Mortgage Co.*,

835 P.2d 1000 (Utah Ct. App. 1992).[6] Both parties misread the holdings of these cases.

RoundPoint argues that *DeBry* limits lender liability to claims by third parties against a

lender. But that reading of *DeBry* overgeneralizes a much narrower holding. In *DeBry*, the

DeBrys purchased a newly constructed office building from a developer. 835 P.2d at 1001. Due

to building defects and code violations, they were unable to legally occupy the building for four

years after their purchase. *Id.* Valley Mortgage had provided a construction loan to the developer

---

[6] The court notes the non-precedential value of these cases, *see Occusafe, Inc. v. EG&G Rocky Flats, Inc.*, 54 F.3d 618, 622 n.1 (10th Cir. 1995) ("In a diversity case, federal courts are not 'absolutely bound' by the decisions of intermediate state appellate courts, but those decisions can be 'persuasive of how the [State] Supreme Court might rule." (citations omitted)).

and the DeBrys brought an action against Valley Mortgage alleging "negligence or lender liability" in regard to the building and its deficiencies. *Id.* at 1002. The trial court dismissed the claim against Valley Mortgage. *Id.* The Utah Court of Appeals analyzed the question of whether a lender owes a duty to a third party, absent a contractual or fiduciary relationship and concluded that "[m]ost courts . . . have been unwilling to extend a duty in [instances where the third party had no contractual relationship with the lender or no interest in the property prior to the purchase contract] absent lender involvement that goes beyond a traditional lender role or where the lender misrepresents material facts to those third parties." *Id.* at 1003. Thus, "lender liability for negligence to a party not in privity[] will not attach unless there are unusual circumstances that exceed normal lending operations." *Id.* at 1006. The *DeBry* court's holding thus speaks only to the duties a construction lender owes to a third party who has purchased property from its borrower. The *DeBry* court did not address whether there could be an action under Utah law for lender liability based on a duty owed by a lender to its own borrower.

Borrowers argue that in *Mecham*, the Utah Court of Appeals "found that lender liability occurs where the lender takes inappropriate control of its borrower." Borrowers summarize the *Mecham* court's holding to be that where a "lender exercises so much control lover a defaulting borrower, the lender incurs tort liability." But that was not the holding of *Mecham*. In *Mecham*, the plaintiff brought an action against both a borrower and a lender, arguing that the lender was liable for the borrower's negligence on an agency theory. 53 P.3d at 481. The plaintiff specifically argued that the lender became the borrower's principal by virtue of the alleged control the lender had over the borrower's affairs. *Id.* at 482–83. However, the trial court "did not find anything unusual about [the lender's] position [as a lender or secured creditor] and that the actions of [the lender] were appropriate and did not exceed its position as lienholder." *Id.* at

482. The Utah Court of Appeals affirmed the trial court's holding that the lender had not exercised sufficient control over its borrower to create an agency relationship that would render the lender liable for the borrower's negligence. *Id.* at 484.

Neither *Mecham* nor *DeBry* apply here. This case involves a lender's conduct toward its borrower. There is no third party allegation that the lender owed it any duty, as was the situation in *DeBry*. Nor does this case deal with a third party alleging lender liability by virtue of a principal-agent relationship between RoundPoint and Borrowers, as was the case in *Mecham*. Borrowers also cite to an American Bar Association Article and cases from other states and circuits, but there appears to be no binding authority or precedent in Utah recognizing a borrower's right to bring a tort claim against a lender. "[A]s a federal court sitting in diversity jurisdiction, our role is to ascertain and apply the proper state law, here that of [Utah], with the goal of insuring that the result obtained is the one that would have been reached in the state courts." *Occusafe*, 54 F.3d at 621 (internal quotation and citation omitted). Because Borrowers cite to no Utah authority recognizing a claim for lender liability in these circumstances, the court cannot conclude that Utah courts would allow the claim to go forward.[7] The court therefore GRANTS Roundpoint's motion for summary judgment on Borrowers' lender liability claim.

## V.   Parties' Motions to Exclude Expert Witnesses

Both parties also bring motions to exclude the other's expert witness entirely. Both Borrowers and RoundPoint argue that the other's expert witness is not qualified to offer the

---

[7] Even if such a claim existed under Utah law, it would not be available in this case because of the economic loss rule. Borrowers have not identified a duty that exists independent of any contractual obligation between the parties. And RoundPoint's duties regarding the Property are duties that are clearly and expressly outlined by the parties' contractual relationship. *See Reighard v. Yates,* 285 P.3d 1168, 1176 (Utah 2012) (citation omitted); *Davencourt at Pilgrims Landing Homeowners Ass'n v. Davencourt at Pilgrims Landing, LC*, 221 P.3d 234, 244 (Utah 2009) ("Where the economic loss rule is at issue, the 'initial inquiry' becomes 'whether a duty exists independent of any contractual obligations between the parties.'" (citations omitted)).

opinions set forth in his expert report. In addition, Borrowers seek to exclude the testimony of RoundPoint's Expert Witness, Ed Cordes, arguing that his report states impermissible legal conclusions and that his relationship with counsel for RoundPoint renders his opinions wholly inadmissible. RoundPoint makes the additional argument that the opinions rendered in the report of Borrowers' expert witness, James E. Schroeder, are not reliable.

RoundPoint's expert, Mr. Cordes, is a certified public accountant who holds a master's degree in accountancy from the University of Nebraska and an undergraduate degree in business administration from Colorado State University. Mr. Cordes has served as the manager of the private business advisory group of Ernst & Young and as a board member and Chairman of the board of a bank holding company. He is a member of the American Institute of Certified Public Accountants and the National Association of Forensic Economics, among other groups. Mr. Cordes testimony focuses on determining "the amount of economic loss, if any, suffered by [Borrowers] in connection with [the] mortgage servicing issue with [RoundPoint]."

Borrowers' expert, Mr. Schroeder, has been licensed and certified in the State of Utah for more than 40 years as a certified public accountant. His experience includes over 49 years of public accounting and business consulting, over 46 years in lending funds secured by real estate, service as the chief financial officer of a finance company and president of a certified accounting firm. Mr. Schroeder has also been actively involved in the investment and rental of residential real estate for more than 48 years. He was retained to provide testimony regarding the amortization of the Loan and to provide the court with a calculation of damages based upon the present value of the Borrowers' investment in the Property.

Admissibility of expert testimony is governed by Federal Rules of Evidence 702, which provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

    (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

    (b)    the testimony is based on sufficient facts or data;

    (c)    the testimony is the product of reliable principles and methods; and

    (d)    the expert has reliably applied the principles and methods to the facts of the case.

It is clear from their résumés that both Mr. Cordes and Mr. Schroeder are qualified "by knowledge, skill, experience, training, [and/]or education" to testify as experts in this matter. The remaining arguments raised by the parties go to the weight of the expert testimony, not to its admissibility as a whole. Because there is no jury demand in this case, the court will hear the expert testimony and will then consider whatever arguments or objections the parties may raise to particular testimony, including arguments regarding bias, the accuracy of the opinions or testimony of the experts, as well as objections as to the form of the opinions. Because both experts are qualified and their testimony is not entirely inadmissible, the court DENIES both motions to exclude expert testimony.

## CONCLUSION

Based on the foregoing, the court GRANTS IN PART and DENIES IN PART Plaintiffs' Motion for Summary Judgment [Docket 57] and GRANTS IN PART and DENIES IN PART Roundpoint's Motion for Summary Judgment [Docket 60]. Specifically,

1. RoundPoint's motion for summary judgment is GRANTED with respect to the first and third causes of action for unjust enrichment and lender liability.

2. Because there is no dispute as to the material facts regarding liability for breach of contract and the fact of damage, RoundPoint is liable for breach as a matter of law, and the court GRANTS Borrowers' motion for summary judgment and DENIES RoundPoint's motion for summary judgment.

3. Because there are disputed facts regarding the amount of damages in this case, the court DENIES both parties' motions for summary judgment on the amount of damages on the breach of contract claim.

4. The parties' motions to exclude expert testimony [Dockets 51 and 52] are DENIED. The court will hear the expert testimony and rule on any objections to specific testimony at the hearing on the amount of damages.

5. Inasmuch as there is no jury demand in this case, a hearing will be set at a future date to ascertain the amount of damages to which Borrowers are entitled on their breach of contract claim.

IT IS SO ORDERED.

Signed December 27, 2016.

BY THE COURT

Jill N. Parrish
United States District Court Judge