IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| NORTHERN REGAL HOMES, INC. and RICK WILLIAMS,<br><br>          Plaintiffs,<br><br>v.<br><br>ROUNDPOINT MORTGAGE SERVICING CORPORATION and NATIONSTAR, INC.,<br><br>          Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 1:15-cv-00035-JNP-BCW<br><br>District Judge Jill N. Parrish |

Plaintiffs Northern Regal Homes ("Regal") and Rick Williams (collectively "Borrowers") sued RoundPoint Mortgage Servicing Corporation ("RoundPoint") for breach of contract.[1] In its December 20, 2016 Memorandum Decision, the court held that RoundPoint was liable for breaching a mortgage loan agreement between the parties as a matter of law. Specifically, the court held that RoundPoint breached its contractual obligations by (1) refusing to accept and returning Borrowers' payments, (2) changing the locks and disabling the garage door openers to Borrowers' Property, thereby depriving Borrowers of their right to the Property, and (3) exercising rights related to an event of default when no such event had taken place. The court held a two-day bench trial on April 26 and 27, 2017, on the appropriate measure and amount of damages stemming from RoundPoint's breach of contract. After hearing the evidence and the parties' arguments, the court makes the following findings of fact and conclusions of law.

---

[1] Plaintiffs also brought claims for lender liability and unjust enrichment, but the court granted Defendant's Motion for Summary Judgment on those claims. (See Dkt. No. 78).

**FINDINGS OF FACT**

In November 2006, Regal and Mr. Williams entered into a construction loan agreement with Barnes Banking Company ("Barnes") for the purpose of constructing a single-family residence located at 4554 West 5750 South in Hooper, Utah[2] (the "Property"). Borrowers executed a promissory note (the "Note") for the principal amount of $295,600.00 that had a maturity date of August 15, 2007. As security for the Note, Borrowers executed and recorded with the Weber County Recorder's Office a construction deed of trust in favor of Barnes (the "Deed of Trust"), encumbering the Property.[3] In May 2007, Borrowers and Barnes entered into a Change in Terms Agreement. The Change in Terms Agreement converted the construction loan to a five year mortgage loan with a maturity date of January 10, 2014. Under the Change in Terms Agreement, the monthly payment due was $2,054.71.

At the beginning of 2010, Barnes ceased its operations. The Federal Deposit Insurance Corporation, as receiver for Barnes, assigned the Loan and its related benefits and obligations to a third party. Servicing of the Loan was transferred to RoundPoint in February 2011 and the Loan was eventually sold to RoundPoint.

Although Borrowers had timely made all monthly payments to that point, RoundPoint sent a letter to Borrowers on October 13, 2011, informing them that the Loan was in default. Borrowers responded by letter dated October 25, 2011, explaining to RoundPoint that Borrowers had not missed any payments and disputing the alleged default. Borrowers proceeded to send their November 2011 payment by check to RoundPoint only to have the payment rejected and

---

[2] The Property is more particularly described as Lot 54, Freedom Estates Phase 3, Hooper City, Weber County, Utah, according to the Official Plat thereof, on file and of record in the Office of the Weber County Recorder.

[3] The parties' agreement consists of the construction loan agreement, the Note, and the Deed of Trust. These agreements are referred to collectively as the "Loan."

the check returned. In December 2011, Borrowers again tendered payment to RoundPoint (enclosing checks for both the November and December payments), only to have their payments again rejected and the checks returned to them. Borrowers again sent payment to RoundPoint in January (enclosing checks for November, December, and January) only to have RoundPoint reject the payments and return the checks to them once again. Borrowers continued this same practice of sending the current month's payment, as well as the previously rejected payments, over the subsequent few months. In total, RoundPoint received and then rejected and returned Borrowers' payments for six months from November 2011 to April 2012. After RoundPoint rejected these six consecutive payments, Borrowers ceased making payments on the Loan. Despite numerous attempts by Borrowers to get RoundPoint to correct its error regarding the payment history on the Loan, RoundPoint pursued the erroneous default, twice initiating foreclosure proceedings on the Property, but cancelling those proceedings before foreclosure had been completed.

During this time, the Property was occupied by Ben Rose and his family. Mr. Rose responded to a classified advertisement posted online that advertised the Property as available to lease with an option to buy. Borrowers and Mr. Rose negotiated a two-year lease of the Property with rent payments of $1,950.00 per month. Borrowers and Mr. Rose contemplated that, at the conclusion of the two-year term, Mr. Rose would discuss with Borrowers the possibility of exercising his option to purchase the home. Although Mr. Rose inquired with Borrowers near the end of the two-year term about purchasing the Property, Borrowers could not negotiate the sale of the property at that time due to the alleged default and ongoing dispute with RoundPoint. Eventually Mr. Rose and his family found another home to purchase that included a home

warranty and other options that Borrowers were unable to offer. Mr. Rose thereafter declined to exercise his purchase option and the Roses moved out of the Property on or about June 12, 2012.

RoundPoint took possession of the Property from Borrowers on June 24, 2012, when it changed the locks and disabled the garage door opener. RoundPoint has remained in possession of the Property continuously since that time, but Regal remains the record owner.

## CONCLUSIONS OF LAW

    I.    Legal Standard for Contract Damages

The purpose of damages in a breach of contract action is "to place the aggrieved party in the same economic position the party would have been in if the contract was not breached.[4]" *Eleopulos v. McFarland & Hullinger, LLC*, 145 P.3d 1157, 1159 (Utah Ct. App. 2006) (citing *Mahmood v. Ross*, 990 P.2d 933, 937 (Utah 1999)). *See also Anesthesiologists Assoc. v. St. Benedict's Hosp.*, 884 P.2d 1236, 1238 (Utah 1994) ("Damages awarded for breach of contract should place the non[-]breaching party in as good a position as if the contract had been performed." (internal quotation marks and citation omitted)); *Trans-W. Petrol., Inc. v. U.S. Gypsum Co.*, 379 P.3d 1200, 1206 (Utah 2016) ("Utah law provides the injured party in a breach of contract action with 'a right to damages based upon his expectation interest.'" (quoting *TruGreen Cos., L.L.C. v. Mower Bros., Inc.*, 199 P.3d 929, 931 (Utah 2014))). Two types of damages accomplish that purpose: "general damages, which flow naturally from the breach, and

---

[4] RoundPoint asserts the affirmative defense of setoff. As RoundPoint correctly points out, the doctrine of setoff is a corollary to the concept that the non-breaching party is to be put in the same economic position it would have been absent the breach. *See Ford v. Am. Express Fin. Advisors, Inc.*, 98 P.3d 15, 25–27 (Utah 2004). A non-breaching party's damages must not provide it with a windfall and "any cost or other loss that [it] has avoided by not having to perform" is subtracted from its damages. *Id.* (citing Restatement (Second) of Contracts § 347 (1981)) (emphasis omitted).

consequential damages, which, while not an [inevitable] result of breach, were reasonably foreseeable by the parties at the time the contract was entered into." *Mahmood*, 990 P.2d at 937.

General damages are "'implied in law' because they are 'the probable and necessary result of[ ] the injury.'" *Trans-W. Petrol.*, 379 P.3d at 1206–07 (quoting *Cohn v. J.C. Penney Co.*, 537 P.2d 306, 307–08 (Utah 1975)). Consequential damages "'are the natural, but not the necessary, result of an injury . . . and thus are not implied by law.'" *Id. See also Mahmood*, 990 P.2d at 937 ("[C]onsequential damages, which, while not an [inevitable] result of breach, were reasonably foreseeable by the parties at the time the contract was entered into."). They are measured "not by the value of the promised performance alone but by the gains such performance could produce for collateral reasons, or the loss that is produced by the absence of such performance." *Id.* at 1204. "To recover consequential damages, an injured 'party must prove (1) that consequential damages were caused by the contract breach; (2) that consequential damages ought to be allowed because they were foreseeable at the time the parties contracted; and (3) the amount of consequential damages within a reasonable certainty.'" *Trans-W. Petrol.*, 379 P.3d at 1207 (quoting *Mahmood*, 990 P.2d at 938).

The fact of damages resulting from a breach of contract must be proven with reasonable certainty. *See Atkin, Wright & Miles v. Mtn. States Tel. & Tel. Co.*, 709 P.2d 330, 336 (Utah 1985). But "the standard for determining the amount of damages is not so exacting as the standard for proving the fact of damages . . . ." *Id.* The amount of damages must be supported by "evidence that rises above speculation and provides a reasonable, even though not necessarily precise, estimate of damages." *Id.* Finally, "[i]f a continuing breach . . . [is] a continuing cause of damage, a court may measure the damage up until the time of trial." *Trans-W. Petrol.*, 379 P.3d at 1204 n.2 (citation omitted).

II. Disposition of the Property

Borrowers offer two damage theories that they claim will place them in the same economic position they would have occupied had had there been no breach by RoundPoint. First, Borrowers suggest that the court order 1) that possession of the Property to be returned to them; 2) that the Loan balance be reduced as if all monthly payments had been made through the date of judgment; and 3) award a monetary judgment (or further reduce the mortgage balance) for lost rents, for reputation damages, and to allow Plaintiffs to restore the home inasmuch as it has sat vacant for nearly five years. The alternative damages theory suggested by Borrowers suggest is for the court to order 1) that title to the Property be transferred to RoundPoint and 2) award monetary damages to Borrowers for the equity they would have accumulated in the Property through the date of judgment, plus the present value of their investment in the Property, and reputation damages.

The court concludes that the measure of damages that will place Borrowers in the same economic position they would have occupied absent RoundPoint's breach is to transfer ownership of the Property to RoundPoint[5] and then to award Borrowers damages to compensate them for the equity they would have had in the Property, less the expenses they would have incurred in maintaining and renting the property. The court finds that transferring the Property to RoundPoint is appropriate inasmuch as the term of the Borrowers' loan has now expired and RoundPoint has been in possession of the Property since it unlawfully took possession of the Property in June 2012. The Property has sat vacant since then and its exact condition is unknown at this time. Further, RoundPoint is now the owner of the Loan on the Property. Thus,

---

[5] At trial, Borrowers indicated their preference that title to the Property be transferred to RoundPoint given the uncertain condition of the Property duty to the lengthy period it has been vacant. RoundPoint agreed that the court has equitable power to order such a transfer.

transferring ownership of the Property to RoundPoint will obviate the need for Borrowers to seek new financing on the Property and will minimize the uncertainty to Borrowers created by the unknown condition of the home.

III. Calculation of Damages

At the trial on damages, Plaintiffs' expert, Mr. Schroeder, provided an amortization schedule detailing what the balance would be on the Loan through June 10, 2017, had the payments been made by Borrowers and accepted by RoundPoint. (Pl. Ex. 17). Mr. Schroeder testified that if the Property was not returned to the Borrowers, the damage award should consist of two elements: 1) the rents that would have been received over a 30-year period and 2) the value of the Property when liquidated at the end of the 30-year operating cycle of the investment in the Property.

RoundPoint contends that Borrowers' damages theory is severely flawed. Specifically, RoundPoint argues that awarding damages for both the loss of rents for a 30-year period and the loss of the value of the Property constitutes a "double-dip" and therefore would constitute a windfall for Borrowers. RoundPoint's expert, Mr. Cordes, testified that Borrowers' damages theory would result in a double recovery for Borrowers. He explained that it is not appropriate for Borrowers to receive both the value of the Property and the expected rents because the value of the Property reflects the expectation of future cash flows. In short, the Property's value is based upon its potential to earn monthly income in the form of rents. While Borrowers' expert attempted to explain why Borrowers' proposed damage theory was not a double-dip, the court was not persuaded by his reasoning. It therefore finds that the damages award sought by Borrowers would constitute a windfall and double recovery for the Borrowers.

7

RoundPoint also argues that Borrowers failed to mitigate their damages. A nonbreaching party has a duty to "actively . . . mitigate his damages," *Utah Farm Prod. Credit Ass'n v. Cox*, 627 P.2d 62, 64 (Utah 1981), and to make "reasonable efforts and expenditures" to prevent further injury. *Madsen v. Murrey & Sons Co.*, 743 P.2d 1212, 1214 (Utah 1987) (citation omitted). First, RoundPoint argues that Borrowers should have pursued other rental or sale options for the Property after the Roses moved out. Second, RoundPoint argues that Borrowers never attempted to gain access to the Property by requesting that they be given the keys or by rekeying the Property themselves. Third, RoundPoint argues that after it sent Borrowers a letter in September 2013 acknowledging the errors in its accounting of payments made on the Loan and offering to reconcile the account, Borrowers should have worked with RoundPoint to resolve the issues regarding the Loan. Finally, RoundPoint argues that Borrowers could have sold the Property at any time as a means of mitigating their damages. Specifically, RoundPoint points to a January 2016 letter sent by its counsel to counsel for Borrowers proposing that Borrowers allow RoundPoint to sell the Property—a proposal that Borrowers rejected.

The court is not persuaded by RoundPoint's argument that Borrowers failed to mitigate and finds that its argument is simply not supported by the facts. RoundPoint has conveniently left out key facts and considerations that were facing Borrowers when considering its post hoc proposals for mitigating damages. First, from the time that RoundPoint accused the Borrowers of being in default on the Loan, the legal status of the Property was in doubt. That doubt was confirmed when, on two separate occasions, RoundPoint initiated foreclosure proceedings. And on all occasions when RoundPoint offered to reconcile with the Borrowers, it demanded that Borrowers not only make up the payments that had been rejected and missed, but also to pay RoundPoint for the fees and costs that it incurred in pursuing the non-existent default and

8

wrongful foreclosure. Indeed, the January 2016 letter in which it proposed the sale of the Property included a threat that if Borrowers rejected the proposal, RoundPoint might again institute foreclosure proceedings. RoundPoint continues to blame Borrowers for its mistakes, but the court finds that the facts do not support such an approach. The court finds that it was not feasible for Borrowers to sell or rent the Property at any time due to the doubt surrounding the legal status of the Property as a result of RoundPoint's mistaken accounting of the Loan. The Borrowers have been damaged—and continue to be damaged—by no fault of their own and they did not fail to mitigate their damages.

      Having concluded that title to the Property should be transferred to RoundPoint, the court must now assess the damages necessary to put the Borrowers in the same economic position they would have occupied had RoundPoint not breached the Loan agreement. To do so, the court must compensate Borrowers for the equity they would have had in the Property by giving them the value of the Property less the balance on the loan that would have existed absent the breach. Thus, the court must take into account the cash flow the Property would have produced from the time RoundPoint took possession of the Property. To calculate that amount, the table below reflects the situation the Borrowers would have occupied if they would have collected rent (at an increased rate each year minus the costs of renting the Property) and made the Loan payments to RoundPoint from the time RoundPoint stopped accepting their payments.[6]

---

[6] This calculation and table are largely taken from Mr. Cordes' testimony at trial and the exhibit provided to the court at that time. (Def. Ex. 212). Certain changes were made to account for the age of the home (fewer repairs would be required) and the fact that an insurance policy would be only for the structure and not include any of the contents of the home.

| Date | Rent Rec'd[7] | Vacancy Discount (4.5% of Rent)[8] | Repairs Discount (5% of Rent)[9] | Insurance Discount (3% of Rent)[10] | Net Rent | Loan Payment | Property Taxes | Net Cash (Out) | Cumulative Net Cost to Rent Property |
|---|---|---|---|---|---|---|---|---|---|
| Nov. '11 | $ - | $ - | $ - | $ - | $ - | $ (2,055) | $ - | $ (2,055) | $ (2,055) |
| Dec. '11 | $ - | $ - | $ - | $ - | $ - | $ (2,055) | $ - | $ (2,055) | $ (4,110) |
| Jan. '12 | $ - | $ - | $ - | $ - | $ - | $ (2,055) | $ - | $ (2,055) | $ (6,165) |
| Feb. '12 | $ - | $ - | $ - | $ - | $ - | $ (2,055) | $ - | $ (2,055) | $ (8,220) |
| Mar. '12 | $ - | $ - | $ - | $ - | $ - | $ (2,055) | $ - | $ (2,055) | $ (10,275) |
| Apr. '12 | $ - | $ - | $ - | $ - | $ - | $ (2,055) | $ - | $ (2,055) | $ (12,330) |
| May '12 | $ - | $ - | $ - | $ - | $ - | $ (2,055) | $ - | $ (2,055) | $ (14,385) |
| Jun. '12 | $ - | $ - | $ - | $ - | $ - | $ (2,055) | $ - | $ (2,055) | $ (16,440) |
| Jul. '12 | $ 1,950 | $ (88) | $ (98) | $ (59) | $ 1,706 | $ (2,055) | $ - | $ (349) | $ (16,789) |
| Aug. '12 | $ 1,950 | $ (88) | $ (98) | $ (59) | $ 1,706 | $ (2,055) | $ - | $ (349) | $ (17,138) |
| Sep. '12 | $ 1,950 | $ (88) | $ (98) | $ (59) | $ 1,706 | $ (2,055) | $ - | $ (349) | $ (17,486) |
| Oct. '12 | $ | $ | $ | $ | $ | $ | $ - | $ | $ |

---

[7] Assumed rent was increased by 5.0% per year. Average rent in Ogden, Utah for two bedroom units increased by approximately 4.6% per year between January 2012 and March 2017 per www.rentjungle.com. Because Borrowers actually received rent from the Roses for the period between November 2011 and June 2012, the amount of rent received and the net rent amount are $0 because Borrowers already received the benefit of the rent paid and to include it in this table would constitute a windfall for Borrowers. Similarly, costs of potential vacancy, repairs, and insurance for this time period are not included in this chart because these costs, if any, were already actually paid.

[8] Vacancy was estimated at 4.5%. CoStar Group lists vacancy for apartments in Ogden, Utah at 6/6% between 2012 and 2016 and 7.6% in 2017. Sperling's Best Places vacancy rate for Ogden, Utah is approximately 4.61%. The 4.5% rate was the rate used by RoundPoint's expert.

[9] Repair costs were estimated at 5% of the monthly rent. Mr. Cordes used a 10% estimate in his report. But because the home was built recently, the court assumes that there would be less need for repairs to the Property.

[10] Insurance costs are estimated at 3% of rent, or between $700 and $850 annually to insure the structure of the Property.

| Month | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | $ 1,950 | $ (88) | $ (98) | $ (59) | $ 1,706 | $ (2,055) | | $ (349) | $ (17,835) |
| Nov. '12 | $ 1,950 | $ (88) | $ (98) | $ (59) | $ 1,706 | $ (2,055) | $ (2,312) | $ (2,661) | $ (20,496) |
| Dec. '12 | $ 1,950 | $ (88) | $ (98) | $ (59) | $ 1,706 | $ (2,055) | $ - | $ (349) | $ (20,845) |
| Jan. '13 | $ 1,950 | $ (88) | $ (98) | $ (59) | $ 1,706 | $ (2,055) | $ - | $ (349) | $ (21,193) |
| Feb. '13 | $ 1,950 | $ (88) | $ (98) | $ (59) | $ 1,706 | $ (2,055) | $ - | $ (349) | $ (21,542) |
| Mar. '13 | $ 1,950 | $ (88) | $ (98) | $ (59) | $ 1,706 | $ (2,055) | $ - | $ (349) | $ (21,891) |
| Apr. '13 | $ 1,950 | $ (88) | $ (98) | $ (59) | $ 1,706 | $ (2,055) | $ - | $ (349) | $ (22,240) |
| May '13 | $ 1,950 | $ (88) | $ (98) | $ (59) | $ 1,706 | $ (2,055) | $ - | $ (349) | $ (22,588) |
| Jun. '13 | $ 1,950 | $ (88) | $ (98) | $ (59) | $ 1,706 | $ (2,055) | $ - | $ (349) | $ (22,937) |
| Jul. '13 | $ 2,048 | $ (92) | $ (102) | $ (61) | $ 1,792 | $ (2,055) | $ - | $ (263) | $ (23,200) |
| Aug. '13 | $ 2,048 | $ (92) | $ (102) | $ (61) | $ 1,792 | $ (2,055) | $ - | $ (263) | $ (23,463) |
| Sep. '13 | $ 2,048 | $ (92) | $ (102) | $ (61) | $ 1,792 | $ (2,055) | $ - | $ (263) | $ (23,726) |
| Oct. '13 | $ 2,048 | $ (92) | $ (102) | $ (61) | $ 1,792 | $ (2,055) | $ - | $ (263) | $ (23,989) |
| Nov. '13 | $ 2,048 | $ (92) | $ (102) | $ (61) | $ 1,792 | $ (2,055) | $ (2,680) | $ (2,943) | $ (26,932) |
| Dec. '13 | $ 2,048 | $ (92) | $ (102) | $ (61) | $ 1,792 | $ (2,055) | $ - | $ (263) | $ (27,195) |
| Jan. '14 | $ 2,048 | $ (92) | $ (102) | $ (61) | $ 1,792 | $ (2,055) | $ - | $ (263) | $ (27,458) |
| Feb. '14 | $ 2,048 | $ (92) | $ (102) | $ (61) | $ 1,792 | $ (2,055) | $ - | $ (263) | $ (27,721) |
| Mar. '14 | $ 2,048 | $ (92) | $ (102) | $ (61) | $ 1,792 | $ (2,055) | $ - | $ (263) | $ (27,984) |
| Apr. '14 | $ 2,048 | $ (92) | $ (102) | $ (61) | $ 1,792 | $ (2,055) | $ - | $ (263) | $ (28,247) |
| May '14 | $ 2,048 | $ (92) | $ (102) | $ (61) | $ 1,792 | $ (2,055) | $ - | $ (263) | $ (28,510) |
| Jun. '14 | $ 2,048 | $ (92) | $ (102) | $ (61) | $ 1,792 | $ (2,055) | $ - | $ (263) | $ (28,773) |
| Jul. '14 | $ 2,150 | $ (97) | $ (108) | $ (65) | $ 1,881 | $ (2,055) | $ - | $ (174) | $ (28,947) |
| Aug. '14 | $ 2,150 | $ (97) | $ (108) | $ (65) | $ 1,881 | $ (2,055) | $ - | $ (174) | $ (29,121) |
| Sep. '14 | $ 2,150 | $ (97) | $ (108) | $ (65) | $ 1,881 | $ (2,055) | $ - | $ (174) | $ (29,294) |

|  |  |  |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|---|---|
| Oct. '14 | $ 2,150 | $ (97) | $ (108) | $ (65) | $ 1,881 | $ (2,055) | $ - | $ (174) | $ (29,468) |
| Nov. '14 | $ 2,150 | $ (97) | $ (108) | $ (65) | $ 1,881 | $ (2,055) | $ (2,714) | $ (2,888) | $ (32,356) |
| Dec. '14 | $ 2,150 | $ (97) | $ (108) | $ (65) | $ 1,881 | $ (2,055) | $ - | $ (174) | $ (32,530) |
| Jan. '15 | $ 2,150 | $ (97) | $ (108) | $ (65) | $ 1,881 | $ (2,055) | $ - | $ (174) | $ (32,703) |
| Feb. '15 | $ 2,150 | $ (97) | $ (108) | $ (65) | $ 1,881 | $ (2,055) | $ - | $ (174) | $ (32,877) |
| Mar. '15 | $ 2,150 | $ (97) | $ (108) | $ (65) | $ 1,881 | $ (2,055) | $ - | $ (174) | $ (33,051) |
| Apr. '15 | $ 2,150 | $ (97) | $ (108) | $ (65) | $ 1,881 | $ (2,055) | $ - | $ (174) | $ (33,225) |
| May '15 | $ 2,150 | $ (97) | $ (108) | $ (65) | $ 1,881 | $ (2,055) | $ - | $ (174) | $ (33,398) |
| Jun. '15 | $ 2,150 | $ (97) | $ (108) | $ (65) | $ 1,881 | $ (2,055) | $ - | $ (174) | $ (33,572) |
| Jul. '15 | $ 2,257 | $ (102) | $ (113) | $ (68) | $ 1,975 | $ (2,055) | $ - | $ (80) | $ (33,652) |
| Aug. '15 | $ 2,257 | $ (102) | $ (113) | $ (68) | $ 1,975 | $ (2,055) | $ - | $ (80) | $ (33,732) |
| Sep. '15 | $ 2,257 | $ (102) | $ (113) | $ (68) | $ 1,975 | $ (2,055) | $ - | $ (80) | $ (33,812) |
| Oct. '15 | $ 2,257 | $ (102) | $ (113) | $ (68) | $ 1,975 | $ (2,055) | $ - | $ (80) | $ (33,893) |
| Nov. '15 | $ 2,257 | $ (102) | $ (113) | $ (68) | $ 1,975 | $ (2,055) | $ (3,014) | $ (3,094) | $ (36,987) |
| Dec. '15 | $ 2,257 | $ (102) | $ (113) | $ (68) | $ 1,975 | $ (2,055) | $ - | $ (80) | $ (37,067) |
| Jan. '16 | $ 2,257 | $ (102) | $ (113) | $ (68) | $ 1,975 | $ (2,055) | $ - | $ (80) | $ (37,147) |
| Feb. '16 | $ 2,257 | $ (102) | $ (113) | $ (68) | $ 1,975 | $ (2,055) | $ - | $ (80) | $ (37,227) |
| Mar. '16 | $ 2,257 | $ (102) | $ (113) | $ (68) | $ 1,975 | $ (2,055) | $ - | $ (80) | $ (37,307) |
| Apr. '16 | $ 2,257 | $ (102) | $ (113) | $ (68) | $ 1,975 | $ (2,055) | $ - | $ (80) | $ (37,387) |
| May '16 | $ 2,257 | $ (102) | $ (113) | $ (68) | $ 1,975 | $ (2,055) | $ - | $ (80) | $ (37,467) |
| Jun. '16 | $ 2,257 | $ (102) | $ (113) | $ (68) | $ 1,975 | $ (2,055) | $ - | $ (80) | $ (37,548) |
| Jul. '16 | $ 2,370 | $ (107) | $ (119) | $ (71) | $ 2,074 | $ (2,055) | $ - | $ 19 | $ (37,529) |
| Aug. '16 | $ 2,370 | $ (107) | $ (119) | $ (71) | $ 2,074 | $ (2,055) | $ - | $ 19 | $ (37,510) |
| Sep. '16 | $ | $ | $ | $ | $ | $ | $ - | $ | $ |

|         | $ 2,370 | $ (107) | $ (119) | $ (71) | $ 2,074 | $ (2,055) |         | $ 19    | $ (37,491) |
|---------|---------|---------|---------|--------|---------|-----------|---------|---------|------------|
| Oct. '16 | $ 2,370 | $ (107) | $ (119) | $ (71) | $ 2,074 | $ (2,055) | $ -     | $ 19    | $ (37,473) |
| Nov. '16 | $ 2,370 | $ (107) | $ (119) | $ (71) | $ 2,074 | $ (2,055) | $ (3,130) | $ (3,111) | $ (40,584) |
| Dec. '16 | $ 2,370 | $ (107) | $ (119) | $ (71) | $ 2,074 | $ (2,055) | $ -     | $ 19    | $ (40,565) |
| Jan. '17 | $ 2,370 | $ (107) | $ (119) | $ (71) | $ 2,074 | $ (2,055) | $ -     | $ 19    | $ (40,546) |
| Feb. '17 | $ 2,370 | $ (107) | $ (119) | $ (71) | $ 2,074 | $ (2,055) | $ -     | $ 19    | $ (40,528) |
| Mar. '17 | $ 2,370 | $ (107) | $ (119) | $ (71) | $ 2,074 | $ (2,055) | $ -     | $ 19    | $ (40,509) |
| Apr. '17 | $ 2,370 | $ (107) | $ (119) | $ (71) | $ 2,074 | $ (2,055) | $ -     | $ 19    | $ (40,490) |
| May '17 | $ 2,370 | $ (107) | $ (119) | $ (71) | $ 2,074 | $ (2,055) | $ -     | $ 19    | $ (40,471) |
| Jun. '17 | $ 2,370 | $ (107) | $ (119) | $ (71) | $ 2,074 | $ (2,055) | $ -     | $ 19    | $ (40,453) |

The value of the Property according to the Weber County Assessor is $383,690.00. According to Mr. Schroeder's amortization schedule, the Loan payoff as of June 10, 2017 would be $204,570.00, assuming all payments had been made and accepted from November 2011—when RoundPoint first rejected a payment—until June 2017. As calculated in the previous table, had Borrowers retained possession of the Property and been able to rent it from the time the Roses moved out of the Property until June 2017, they would have incurred a loss of $40,453.00. Thus, to put Borrowers in the same economic position they would have been, Borrowers are entitled to a judgment against RoundPoint in the amount of $138,668.00, as detailed in the following chart.

| County Assessor Value of Property January 1, 2016: | $ 383,690 |
|---|---|

| | |
|---|---|
| Loan Payoff Amount as of 6/10/2017 (Schroeder Amortization): | $ (204,570) |
| Net Cost to Plaintiffs to Rent/Maintain Property | $ (40,453) |
| Judgment amount | $ 138,668 |

Borrowers also claim that they suffered damage to their credit and reputation for prompt payment. Specifically, Borrowers seek $50,000.00—$25,000.00 for Regal and $25,000 for Mr. Williams—as compensation for the damage to their respective reputations as a result of RoundPoint's posting foreclosure notices on the Property, mailing those notices to Borrowers' tenant, Mr. Rose, and publishing the inaccurate foreclosure notices in the Standard Examiner newspaper. Borrowers also point to RoundPoint's agent posting a sign on the Property indicating that it was being managed by an outside third party and the visibility of the vacant home. But the only evidence of any damage to the credit or reputation of the Borrowers is the self-serving testimony of Mr. Williams. Borrowers have provided no documentary evidence of diminished credit scores, lost sales, or other damage to their reputations. And there was no testimony or other evidence regarding the value of any purported damage done. At trial, RoundPoint provided evidence of prior lawsuits against Borrowers for unpaid loans that call into question the existence of Borrowers' prior good reputation for prompt payment. Further, Borrowers presented no evidence of a diminished credit score or any instance where they were denied credit. In short, the court concludes that Borrowers have failed to prove damage to their credit or reputation with reasonable certainty. Accordingly, the court awards no damages for the purported injury to Borrowers' credit and/or reputation.

IV. Conclusion and Order

In accordance with the foregoing, the court ORDERS as follows:

(1) That title to the Property be transferred from Regal to RoundPoint in satisfaction of the Note—as amended by the Change in Terms Agreement—and Deed of Trust;

(2) That judgment be entered against RoundPoint and in favor of Borrowers in the amount of $138,668.00, plus interest at the post-judgment rate from June 10, 2017, through the date of entry of judgment; and

(3) That said judgment shall bear post-judgment interest at the legal rate from the date of entry until paid.

The court FURTHER ORDERS that Borrowers shall have ten days from the entry of this Order to file their bill of costs and any motion for attorneys' fees. RoundPoint may file any objections and memorandum in opposition within ten days after Borrower's bill and motion are filed.

Signed June 9, 2017.

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge